13881

STATE v. EDWARDS *ET AL.*

(175 S. E., 277)

162

*Messrs. L. W. Harris* and *K. P. Smith,* for appellants,

Messrs. *Rufus Fant, Solicitor,* and *Harold Major,* for the State, 

July 5, 1934.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

The appellants were convicted, in the Court of General Sessions of Anderson County, of the crime of statutory arson, with a recommendation by the jury to the mercy of the Court, and the presiding Judge, his Honor, Circuit Judge Greene, sentenced each of them to a term of six years at hard labor on the chaingang of Anderson County, or in the State penitentiary.

In the appeal, there are nine exceptions. The last of ██ these, relating to the receipt of certain testimony of Sheriff Clamp, as a witness for the State in reply, has not been argued, and under our rules, therefore, will not be considered.

In several of the exceptions, the appellants complain of the rulings of the Circuit Judge throughout the trial, and on their motion for a new trial after their conviction, as to the introduction of evidence on the part of the State before proper proof was offered, as they allege, going to establish the *corpus delicti.* Counsel for the appellants contended in the lower Court, as they urge here, that no evidence of any character, except such as tended to establish the *corpus delicti,* could be offered by the State, until there had been presented evidence showing the *corpus delicti.* The rule does not go to that extent. It does forbid the introduction of evidence as to a confession of guilt on the part of

one charged with the crime of arson, until there has been sufficient evidence to go to the jury on the matter of the *corpus delicti. State v. Brown,* 103 S. C., 437, 88 S. E., 21, L. R. A., 1916-D, 1295. There was no evidence adduced in the case of a confession of guilt on the part of either of the appellants, and, accordingly, there was no violation of the rule as to confessions, laid down in the *Brown case.*

There was, it is true, evidence of certain statements on the part of both of the appellants, tending to question the truth of the respective alibis they sought to establish and contradictory of their testimony in the trial, but these statements were in no wise confessions of guilt. They were in the nature of admissions against interest, and were properly admissible. *State v. Pittman,* 137 S. C., 75, 134 S. E., 514. The time of the receipt of this testimony was left very much to the discretion of the trial Judge. Perhaps, usually, the more orderly way of presenting evidence on the part of the State, in an arson case, is for the evidence tending to establish the *corpus delicti* to be first presented. In this case, as it often happens, the statement of a defendant, offered in evidence by the prosecution, may come from a witness whose testimony may also relate to the matter of the *corpus delicti.* In many instances, it would uselessly consume the time of the Court to have a witness to take the stand two or three times for the purpose of testifying as to various relevant matters, when he might testify to all those matters in one examination.

It is contended by the appellants that there was no proof of the *corpus delicti,* and, for failure as to that, the trial Judge, as requested by them, should have directed a verdict of acquittal, and, at least, he should have granted their motion for a new trial. To support the position taken, there is great reliance upon the holdings in the case of *State v. Brown, supra.*

In the *Brown case,* it was ruled, in line with authorities generally recognized, that in an arson case the *corpus delicti*

consists of two elements: The burned building, or structure, and the criminal act of some person in causing the burning. This Court held that in the trial of the case there was only proof as to the first element, "a burned barn"; and there was not a single circumstance that the burning was the result of a criminal act. In this case, there was undoubted proof that the building, a barn, was burned.

As usual, the difficulty is as to the proof of the second element, the criminal agency. Clear proof as to the *corpus delicti* in an arson case is always a difficult matter. The burning usually occurs in the darkness of night, when the incendiary feels assured that there is no human eye who may see his hand apply the brand, and no human ear to hear the fall of his footsteps, as he stealthily approaches and retreats from the place of his criminality. Rarely has it happened that an eyewitness to the crime of arson could be produced. The prosecution in such cases must depend, generally, on circumstantial evidence. That evidence is necessarily often of a negative character; that is, the criminal agency is shown by the absence of circumstances, conditions, and surroundings indicating that the fire resulted from an accidental cause.

In passing upon the issue now being considered, we must keep in mind, of course, that we are not here to determine the sufficiency of the evidence to justify the jury's verdict to the effect that the fire was one of incendiary origin; but we are concerned only with the question as to the sufficiency of that evidence to require the trial Judge to submit the issue of criminal agency to the jury. In other words, if there is any evidence tending to establish the *corpus delicti*, then it was the duty of the trial Judge to pass that question on to the jury, and, likewise, we are required to uphold his ruling. Any reasonable inference that might be drawn by the jury from any circumstances established by competent testimony, indicating that the fire was not occasioned by an accidental cause, but resulted from a criminal agency, would,

under our law, demand that the jury say whether or not the fire was the act of an incendiary.

With the legal principles adverted to before us, we refer as briefly as possible to the facts. For a week prior to the burning, there had been considerable rain. The last person who had any business about the barn, so far as it is known, was the owner, who was there about dark. There had been no fire, lights, or smoking in or about the barn. The fire broke out about midnight. Upon its discovery, the owner, the first person to reach the scene, found the fire burning in each of the two ends of the barn, much more than in the middle part of the building, and the timbers at the ends were already falling in. A calf lot, adjoining the barn, had its door fastened with a wooden "button" on the outside, which, because of the excessive wet weather, had swollen, thereby becoming difficult to be moved, and had to be knocked around to be fastened or unfastened, as the occasion required. While the barn was burning, the calves in the lot burst through the door and ran out, but the button was not broken, and its position gave indication that it had been removed before the calves broke through. There was considerable fodder in the barn in and about both ends, which could be easily reached and fired by a person. Two sets of men's tracks were found, both approaching and going away from the barn. These indicated that two persons had come from the vicinity of a schoolhouse to the barn, across a wet field for a mile, and had gone from the barn across the same field for the same distance to the vicinity of the schoolhouse. The tracks approaching the barn gave indication that their makers had walked in an ordinary manner, but those leaving the barn, for about fifty yards, were wide apart, giving some indication that the persons who made them had travelled hurriedly, perhaps running. The tracks approaching the barn, what we may term the "walking tracks," showed that their makers had gone around some bushes and briars, while one set of tracks, which we

may call the "running tracks," had been made by some person who went straight into, and through, the briars. In the vicinity of the schoolhouse, where the two sets of tracks were evident, tracks of automobile tires were found.

Perhaps neither one of the circumstances mentioned, in itself, was sufficient from which to draw a reasonable inference that the fire was the work of an incendiary. But taking each and every one of the circumstances together, the unlikelihood of the fire being accidental, the wet weather, the "walking" and "running" tracks of men, the automobile tracks, the loose button on the calf lot door, the burning of the building at the beginning of the fire at the two ends, these things were strong enough to require the Court to submit to the jury the issue as to the sufficiency of the proof of the *corpus delicti*.

Our attention has been called to cases from jurisdictions other than ours, wherein the appellate Courts held there was not sufficient evidence as to the criminal agency to require a submission of that issue to the jury. The facts of none of those, however, are similar to the facts which we have here recounted. Only occasionally, too, is the proof in arson cases entirely similar. In our consideration of the cited cases, we have had to keep in mind that the rule in this State, as to leaving an issue of this character to the jury, is a very broad one.

The main case cited from our decisions by the appellants' counsel, that of *State v. Brown, supra,* does not, in our opinion, as they contend, demand that we hold there should have been a directed verdict for failure of the evidence to establish the *corpus delicti*. The prosecution there, according to the report of the case, to support the claim that the fire was the result of a criminal act, depended upon tracks, statements of the defendants showing enmity towards the owner of the building, and the action of bloodhounds in pointing to the accused as the guilty persons. The Court found there were no peculiarities as to the tracks, and it was shown that

"the conduct of the dogs" was not free and voluntary, but that they were guided by the trainer and manager. Really, the statements of the accused and the actions of the dogs did not go to the proof of the *corpus delicti,* but to the probability of the guilt of the accused, if the fire was the result of a criminal act. The only circumstances in the case, therefore, tending to show that the fire may have been of incendiary origin was the tracks about the building, and the case fails to show not only any peculiarity about the tracks, but to give any indication whether or not they had been made by some person other than one who had business about the barn. As already pointed out, there were circumstances here other than the tracks to give some indication that the fire was not occasioned by an accidental cause, and likely was of incendiary origin.

The appellants further urge that even if there was proof of the *corpus delicti,* yet the evidence tending to show their guilt of the burning was entirely insufficient to justify the submission of the case to the jury, that a verdict of not guilty should have been directed on that account, and, certainly, for failure of such evidence, there should have been a new trial. In disposing of the exceptions making this question, we must keep in mind the same legal principle, to which we have heretofore referred, as to the duty of the Court to submit the case to the jury, when there is any evidence tending to prove the affirmative of any issue required to be established by the State.

There was testimony of ill feeling on the part of the appellant Purgason towards Church, the owner of the barn; that Purgason had formerly been employed by the owner at his farm, and there were reasonable inferences that he was well acquainted with the barn and its surroundings and the habits of the owner; that Purgason and Edwards were brothers-in-law; that about 10 o'clock on the night of the burning, Purgason tried to rent an automobile from Crawford, engaged in the taxi business in the City of Anderson,

who declined to let Purgason have the car; that at about 10:45 that night, about one hour prior to the discovery of the fire, Edwards rented a Chevrolet automobile from Crawford; the car was returned at about 12:45, about one hour after discovery of the fire, and the speedometer showed that during the time Edwards had the car in his possession he had traveled approximately thirty-two miles; the distance from the City of Anderson to the burned barn, along a certain road, was seventeen miles, and the mentioned schoolhouse was a mile nearer to Anderson, being about sixteen miles from that city; one traveling from Anderson to the schoolhouse, from there back to Anderson, would travel about thirty-two miles; the automobile tracks discovered about the schoolhouse were quite similar to tracks made by the Chevrolet automobile rented from Crawford by Edwards; the two sets of tracks from the schoolhouse to the barn, and from the barn to the schoolhouse, could have been made by the shoes of Edwards and Purgason, according to the testimony of the officers, who used the appellants' shoes in comparison with the tracks; one of the shoes of Purgason had a worn place under the ball of the foot, and that worn place fitted the impression of one of the tracks made in the ground; Edwards, when arrested by Sheriff Clamp, according to that witness, said "before he would squeal on his brother-in-law Purgason he would make ten years on the chaingang."

The evidence offered by the appellants, tending to establish their alibis, was far from convincing. Their testimony did not tally with statements made before the trial to the officers. The contradictory statements and explanations as to incriminating circumstances were such, in connection with the other facts developed in the case, to warrant an inference of guilt of the appellants. *State v. Pittman, supra.*

The jury were carefully instructed by the presiding Judge that they should be satisfied beyond a reasonable doubt that the fire was the result of an incendi-

ary act, and that the evidence showed beyond a reasonable doubt that the defendants were guilty of setting the fire, before they should be convicted. After hearing that evidence and observing the witnesses, the jury, composed of twelve citizens of the County of Anderson, where the appellants, two white men, lived, found them guilty. The distinguished trial Judge, a resident of the county for many years, heard the evidence and saw the witnesses, and he has not thought it well to disturb the verdict rendered. We have no power to say on the facts that the verdict of the jury was wrong. While we have the power to declare that a Circuit Judge has committed error of law, we cannot say that there was such error in the instant case, when the Judge declined to grant the motion for a directed verdict, or to grant a new trial.

In the sixth exception of the appellants, they complain that since they were not charged in the indictment with the specific crime of conspiracy, it was error for the trial Judge to instruct the jury to the effect that where two or more persons conspire together to commit a crime, and the crime is committed, all who were present aiding, abetting, and assisting in the commission of the crime were equally guilty; the act of one being the act of all. While the indictment did not charge the appellants with the crime of conspiracy, the instructions were altogether applicable. The appellants were charged jointly with the crime of arson. If they agreed or conspired together to commit the crime, and one of them actually set the fire, and the other was present and aided or abetted therein in any manner, for instance, by watching while the fire was being set, the watcher, under the law, was guilty as a principal in the crime.

The remaining exception to be considered, the seventh, charges reversible error on the part of the presiding Judge in interrupting an attorney for the appellants in his cross-examination of the prosecuting witness, the owner of the barn that was burned, and in the re-

marks made by the Judge at that time to the attorney. From the record before us, it appears that the cross-examining attorney and the witness were both rather heated during the examination, and, evidently, both of them were talking in very loud tones. The Judge interrupted with the following statement: "Both of you now. Ask your questions civilly, Mr. Harris, and you answer them civilly, Mr. Witness. Mr. Harris, you're a pretty big man and have got a pretty big voice. Try to modulate your voice so as not to appear to be gouging the witness." The attorney, Mr. Harris, asked: "Do I understand the Court to rule that I am gouging him?" To that question, the trial Judge very courteously replied: "No, except that sometimes a lawyer will forget himself when he has a strong voice and talk just a little bit louder than he ought to when examining a witness."

The appellants particularly object to the word "gouge." While a "gouger," according to Mr. Webster, is a "cheat, fraud and trickish person," the word is a "slang one," often used in the United States, not meaning exactly that the person referred to is always a cheat or a fraud. It is used sometimes with the idea that gouging means "digging or pressing" a person for the purpose of obtaining information. It is to be noted that the trial Judge did not charge Mr. Harris with the offense of "gouging the witness." Rather was he endeavoring to assist the attorney in keeping it from appearing that he was "gouging" him, which appearance was due not so much to the questions being asked by the attorney, but the manner, especially his loud tone of voice, in asking them. The last remarks of the Judge show clearly that his purpose was to have the examination of the witness conducted in an orderly manner, and it was proper for him to do so. There does not appear to us to be any reasonable basis for the suggestion of error because of this occurrence.

The judgment of this Court is that the judgment below be, and the same is hereby, affirmed.

Messrs. Justices Stabler, Carter and Bonham and Mr. Acting Associate Justice W. C. Cothran concur.